[Cite as *State v. Torman*, 2016-Ohio-748.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## PUTNAM COUNTY

**STATE OF OHIO,**

    **PLAINTIFF-APPELLEE,**                 **CASE NO. 12-15-10**

    **v.**

**DAVID R. TORMAN, JR.,**                **O P I N I O N**

    **DEFENDANT-APPELLANT.**

**Appeal from Putnam County Municipal Court**
**Trial Court No. 2015 CRB 89**

**Judgment Affirmed**

**Date of Decision: February 29, 2016**

**APPEARANCES:**

    *Esteban R. Callejas* **for Appellant**

    *Gary L. Lammers* **for Appellee**

**PRESTON, J.**

{¶1} Defendant-appellant, David R. Torman, Jr. ("Torman"), appeals the August 21, 2015 judgment entry of conviction and sentence of the Putnam County Municipal Court. He argues that his conviction for domestic violence is based on insufficient evidence and is against the manifest weight of the evidence. For the reasons that follow, we affirm.

{¶2} This case stems from a May 13, 2015 altercation between Torman and his wife, Pamela K. Torman ("Pamela"). (*See* Doc. No. 1). That same day, Lieutenant Josh Strick ("Strick") of the Ottawa Police Department filed a complaint alleging that Torman committed domestic violence in violation of R.C. 2919.25(A), a first-degree misdemeanor. (*Id.*). Torman entered a plea of not guilty to the count, and the trial court held a bench trial in August 2015. (*See* Doc. Nos. 7, 43, 44).

{¶3} On August 21, 2015, the trial court issued its judgment entry of conviction and sentence. (Doc. No. 50). In it, the trial court found Torman guilty of domestic violence and sentenced him to pay a fine of $150 and serve 180 days in jail, with 160 days suspended on certain conditions. (*Id.*).

{¶4} Torman filed his notice of appeal on September 17, 2015. (Doc. No. 60). He raises one assignment of error for our review.

**Assignment of Error**

**The trial court erred when it found the Appellant guilty against the manifest weight of the evidence and sufficiency of the evidence.**

{**¶5**} In his assignment of error, Torman argues that his conviction for domestic violence is based on insufficient evidence and is against the manifest weight of the evidence. Specifically, Torman argues that the State's witnesses contradicted themselves and lack credibility, especially when compared to the version of the events to which Torman testified at trial. He also argues that Pamela's supposed injuries—redness on her face—were so insignificant that she did not seek medical attention and did not miss any work.

{**¶6**} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1981), paragraph two of the syllabus, superseded by state constitutional amendment on other grounds as stated in *State v. Smith*, 80 Ohio St.3d 89 (1997). Accordingly, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts

nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33, citing *State v. Williams*, 197 Ohio App.3d 505, 2011-Ohio-6267, ¶ 25 (1st Dist.). *See also State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19 ("Sufficiency of the evidence is a test of adequacy rather than credibility or weight of the evidence."), citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

{¶7} On the other hand, in determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[ ] the evidence and all reasonable inferences, consider[ ] the credibility of witnesses and determine[ ] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial

court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

**{¶8}** Torman was convicted of domestic violence in violation of R.C. 2919.25(A), which provides, "No person shall knowingly cause or attempt to cause physical harm to a family or household member." Accordingly, to find Torman guilty of domestic violence in violation of R.C. 2919.25(A), the State was required to prove that he "(1) knowingly caused or attempted to cause, (2) physical harm, (3) to a family or household member." *State v. Miller*, 3d Dist. Seneca No. 13-12-52, 2013-Ohio-3194, ¶ 29. Torman does not challenge Pamela's status as a family or household member.[1] Therefore, our inquiry will focus on the first two elements. *See id.*

**{¶9}** "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B). *See also Miller* at ¶ 30. In *Miller*, we explained:

> "'Knowingly' does not require the offender to have the specific
>
> intent to cause a certain result. That is the definition of 'purposely.'
>
> Instead, whether a person acts knowingly can only be determined,

---

[1] The definition of "family or household member" includes a spouse "who is residing or has resided with the offender." R.C. 2919.25(F)(1)(a)(i).

absent a defendant's admission, from all the surrounding facts and circumstances, including the doing of the act itself."

*Id.*, quoting *State v. Huff*, 145 Ohio App.3d 555, 563 (1st Dist.2001). "'Physical harm to persons' means any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3). *See also Miller* at ¶ 32.

**{¶10}** At trial, the State presented the testimony of four witnesses: Pamela; Eileen Kihm ("Kihm"), Pamela's neighbor; Strick, the investigating law enforcement officer; and Pamela's daughter, Cassidy. First, Pamela testified that on the afternoon of May 13, 2015, she received a text message from Torman asking her if she would administer a shot to Torman's dog. (Aug. 6, 2015 Tr. at 5-7). Pamela and Torman were then and still are married, but they were living apart at the time, so when Pamela agreed to Torman's request, Torman went to Pamela's apartment. (*Id.* at 6-7, 9). Only Pamela and Torman were present. (*Id.* at 9). Torman also asked if Pamela could "sell some things for him [sic] online garage sales" and fix his phone so that he could access the internet on it. (*Id.* at 7). Pamela changed the settings on Torman's phone and handed it back to him. (*Id.*).

**{¶11}** According to Pamela, when she "first left [Torman], he told [her] for [her] to be able to keep one of [her] vehicles [she] had to give him $800." (*Id.* at 8). Pamela testified that she brought that up to Torman when he came to her apartment, telling him that she "didn't think that it was right for [her] to have to

pay him $800 for [her] vehicle, and he got an attitude." (*Id.*). Pamela testified that the altercation—which took place in her living room—then became physical:

> He grabbed me by my face with just one hand, grabbed [my chin and jaw] and squeezed, I don't know if it was as hard as he could or what, but I went to reach for my phone, he went to reach for my phone, I got away from him, I got outside, and I knocked on the neighbor's door and told her to call the cops.

(*Id.* at 8, 14). Pamela testified that Torman did not grab her phone because she "moved it to where he couldn't get it." (*Id.* at 9). According to Pamela, "it hurt" when Torman squeezed, and it resulted in "a little bruising." (*Id.* at 8). She did not have to seek medical attention, nor did she miss any work because of it. (*Id.* at 8-9). Torman did not grab her arm, and her arm was not injured or harmed in any way. (*Id.* at 9). Pamela could not recall if Torman said anything to her or made any comment as he grabbed her. (*Id.* at 11). According to Pamela, nothing was "tipped over" or "broken," and no one fell down or was put "in a position where they were unable to move." (*Id.* at 13-14).

{¶12} Pamela elaborated that after she got away from Torman, she yelled and told him to leave, and she left the apartment and yelled outside her next-door neighbor Kihm's door, saying "call the cops." (*Id.* at 11). Pamela testified, "I didn't knock on her door I just yelled." (*Id.*). According to Pamela, Torman heard

her tell Kihm to call the police, and after that, "he got in his truck and he left." (*Id.* at 11-12). As Torman was driving away, Pamela spoke with the 911 dispatcher because the dispatcher wanted to speak with her. (*Id.* at 12). According to Pamela, "From the time that he got there until the time he got in his truck and left was maybe 15, 20 minutes." (*Id.* at 10). Pamela testified that law enforcement responded and arrived at her address. (*Id.* at 13).

{¶13} On cross-examination, Pamela admitted that Torman was welcome to come over to her apartment. (*Id.* at 16-17). Pamela testified that as she fixed Torman's phone, she did not notice any type of photographs on the phone that caused her to become angry with Torman. (*Id.* at 18). According to Pamela, she and Torman were trying to divide the property between them, and Torman became upset when she told him, "I wasn't going to give him $800 for a vehicle that was in my name." (*Id.*). That is what sparked the argument between Pamela and Torman, according to Pamela. (*Id.* at 19). Pamela testified that she did not touch, punch, or slap Torman. (*Id.*). Torman did not come after Pamela after she broke away from him. (*Id.* at 20). According to Pamela, she and Torman separated in April 2015—the month before the incident—and they interacted once during that time, other than the May 13, 2015 incident. (*Id.* at 22).

{¶14} On re-direct examination, Pamela testified that when Torman grabbed her by the face, she felt threatened and "scared to death of him." (*Id.* at

23). According to Pamela, Torman made no threatening statements to her during the incident, but "[h]e did say something to the effect that he would make it to where neither one of [Pamela's] vehicles would run." (*Id.*). Pamela could not recall exactly when during the incident Torman said that. (*Id.*).

{¶15} The State's next witness was Kihm. (*Id.* at 24). When asked if she recalled whether Pamela came to her door asking her to call for help on May 13, 2015, Kihm testified:

> Her daughter did. She was at the door fighting off seemed like an attacker to me, and her daughter and her daughter's friend came over, and they were trying to dial 911 and couldn't, they were trying and they were just so upset, they couldn't get the number, so I dialed it for them.

(*Id.* at 25-26). According to Kihm, she could tell that an altercation was occurring because "[t]he yelling and things." (*Id.* at 26, 28). Kihm testified, "[W]hen I opened the door I saw [Torman] * * * shoving her and yelling at her and things." (*Id.* at 26, 28-29). When asked if she opened the door, Kihm testified, "No, actually [Pamela's] daughter opened the door and came in" and was "all upset." (*Id.* at 26-27). Kihm testified, "But that's usual, her daughter does come over all the time." (*Id.* at 26). According to Kihm, she was not paying attention to what was said during the altercation. (*Id.* at 27). Kihm testified, "I just know there was

an altercation, and I opened the door to see, check, and that's when Cassidy came in * * *." (*Id.*). The prosecutor further inquired of Kihm:

[Prosecutor]: And what, as you came out the door or to your door, the door is open, you see this, do you hear anything else, I mean words being uttered, threats being made, what if anything?

[Kihm]: He was threatening, but I don't recall any certain words or anything he was really saying, just a lot of yelling against her and –

[Prosecutor]: You saw physical contact between the two?

[Kihm]: I'm not sure. Yeah, I think so, I think, I'm pretty sure that he was shoving her. I don't know, it looked like he was hitting her, but I won't say that for sure.

(*Id.* at 30).

{¶16} Kihm testified that, after she observed the altercation, she and Cassidy dialed 911 together, and Kihm spoke with the dispatcher. (*Id.*). According to Kihm, Pamela did not come into Kihm's apartment and instead "went back in hers and made sure her door was shut." (*Id.*). Kihm did not see Torman leave but realized that he was gone after the altercation. (*Id.* at 31). Kihm testified that she checked to see if Pamela needed medical attention. (*Id.*). When

asked if she saw any physical injuries on Pamela, Kihm responded, "I think her face was red." (*Id.*).

{¶17} On cross-examination, Kihm testified that she did not provide a written statement concerning the incident, but when Torman's counsel presented her with a written statement, Kihm stated that she "[a]pparently" provided the undated written statement that "[p]robably" concerned the May 13, 2015 altercation she observed. (*Id.* at 33-34). Kihm admitted that her written statement does not mention: that Kihm saw a man shoving Pamela; that Cassidy came to her residence; and that Kihm saw redness on Pamela's face. (*Id.* at 35).

{¶18} On re-direct examination, Kihm testified that she saw a man "up around [Pamela]." (*Id.* at 38). Kihm continued, "I won't say pushing, I won't say shoving, I won't say hitting, but he was in a threatening mode. * * * So I can't, I mistakenly said hitting or anything like that if I did, because I didn't see it completely, just the threatening and up near her face and stuff, so, and to me that's abuse." (*Id.* at 39). Kihm testified that the man's hands were near Pamela's upper body and face. (*Id.*). Kihm testified that the man was yelling at Pamela. (*Id.*).

{¶19} Strick was the State's next witness. (*Id.* at 40). He testified that he was dispatched to Pamela's residence on May 13, 2015. (*Id.* at 41). Strick testified that when he arrived, Pamela "was emotionally upset, crying." (*Id.* at 42). According to Strick, Pamela stated that she got in an argument with Torman over

money, and "he grabbed her by the jaw area with both hands and squeezed her." (*Id.*). Strick testified, "I did observe a slight red mark on the right side of her jaw." (*Id.*). Strick testified that he spoke with Cassidy, but "it didn't sound like she was pertinent to the investigation as far as hearing, witnessing anything, aside from maybe running over to the neighbor's house to call 911," so he did not involve her in the case. (*Id.*). Strick spoke with Kihm who "stated she heard yelling, called 911." (*Id.*).

{¶20} On the day of the altercation, Strick also spoke by telephone with Torman. (*Id.* at 43). According to Strick, Torman's verbal statement was "[b]asically * * * consistent with [Pamela's] initial statement," except that Torman said that while Pamela was working on Torman's phone, "some text messages, some possible nude photos came over on the cell phone." (*Id.*). Strick testified that Torman told him that Pamela saw "a nude picture from his girlfriend" and "became mad, and that's what the argument started over." (Aug. 21, 2015 Tr. at 9); (Aug. 6, 2015 Tr. at 43). Torman told Strick "that [Pamela] started yelling and screaming for someone to call 911." (Aug. 6, 2015 Tr. at 43). Strick testified that Torman told him that "he began to leave, and * * * [Pamela] threw something at his truck and shattered his back window." (*Id.* at 43-44). Strick requested to see the truck window, but Torman "never showed back up," so Strick does not know

whether Torman's truck window was broken. (*Id.* at 44). Strick did not see any glass on the ground during his investigation. (Aug. 21, 2015 Tr. at 10-11).

**{¶21}** On cross-examination, Strick testified that he did not include Cassidy in his report because she did not witness any actual physical altercation. (Aug. 6, 2015 Tr. at 45). According to Strick, Cassidy told him that "[s]he was at the house" and "basically when [Torman] showed up, she leaves." (*Id.*).[2] When cross-examination of Strick resumed on August 21, 2015, Strick explained how Cassidy responded when he interviewed her on the date of the altercation: "Basically she stated that she new [sic] Mr. Torman was coming over to the house. She advised they never got along very good. She knew he was coming over so she left." (Aug. 21, 2015 Tr. at 6). Strick testified that Cassidy "did not witness anything" and only "heard some yelling initially when Mrs. Kihm called 911." (*Id.* at 6-7). According to Strick, Kihm told him that she did not see anything but did hear yelling and screaming. (*Id.* at 7). Strick testified that when he spoke with Torman regarding his version of the events, Torman denied touching Pamela and "advised he was going to take a polygraph test to clear this matter up." (*Id.* at 9).

**{¶22}** On re-direct examination, Strick testified that no polygraph test was performed on Torman, nor were any arrangements made for one. (*Id.* at 10-11). According to Strick, Pamela denied throwing a rock at Torman's truck and "stated

---

[2] At this point, the trial court granted Torman's request for a continuance of the trial so that Torman's counsel could interview previously undisclosed witnesses. (Aug. 6, 2015 Tr. at 47).

that the window had been broke for a couple of days." (*Id.* at 11). Strick testified that Kihm informed him that she "watched [Torman] walk to his truck" and that Pamela "never left the sidewalk" and did not throw anything at Torman or his truck. (*Id.*).

{¶23} The State next called Cassidy to testify. (*Id.* at 13). She testified that on May 13, 2015, Pamela told her that Torman was coming over, which made Cassidy "[u]ncomfortable," so she went to Kihm's residence before Torman arrived. (*Id.* at 15-16). According to Cassidy, no one else was with her when she went to Kihm's house. (*Id.* at 16). After staying at Kihm's residence for five minutes, Torman arrived in the parking area, knocked on Pamela's door, and Pamela let him in her apartment. (*Id.* at 17-19). Cassidy watched him through the storm door of Kihm's apartment. (*Id.* at 17-18). Cassidy then testified, "I heard my mom yelling, and then I heard her say get out of my house and get off me." (*Id.* at 20). According to Cassidy, Pamela left her apartment, stood "on the stoop" outside Kihm's apartment, and "told [Kihm] to call 911." (*Id.*). Cassidy testified that Torman walked out of the house "[i]n a hurry" behind Pamela, got in his truck, and "pretty much peeled out of the parking lot." (*Id.* at 21-22). Cassidy testified that Pamela stayed on the stoop outside Kihm's apartment and did not throw anything. (*Id.* at 22). According to Cassidy, she told Strick, once he arrived at the scene, that she "heard yelling" but "didn't see his hand on [Pamela]." (*Id.* at

23-24). Cassidy testified that she observed scratches or marks on Pamela after the altercation, but Pamela was not bleeding. (*Id.* at 25). According to Cassidy, from the time Torman arrived to the time he left lasted about one-half hour. (*Id.*).

{¶24} On cross-examination, Cassidy testified that when she told Strick that she "heard yelling," she meant she heard Pamela and Torman yelling at one another. (*Id.* at 31-32). Cassidy testified that Torman was in Pamela's house "[a]bout 25 minutes." (*Id.* at 33). According to Cassidy, the yelling and arguing began "[a]bout 10 minutes" after Torman arrived, then stopped for "[a]bout two minutes," then started up again, then stopped for about five minutes, at which point Torman left. (*Id.* at 33-34). Cassidy agreed when asked if, from photographs of Pamela, "it's very difficult to see if there is any kind of bruising or marks on her." (*Id.* at 35). Cassidy testified that within a "15 minute span of time," she noticed bruising on the left side of Pamela's face, which she did not have before the altercation with Torman. (*Id.* at 35-36). Cassidy also noticed scratches on Pamela. (*Id.* at 36). Aside from Pamela telling Cassidy of her injuries, Cassidy does not know how Pamela's injuries occurred. (*Id.*).

{¶25} Torman was the sole witness for the defense. (*Id.* at 41). He testified that between his and Pamela's separation in April 2015 to May 13, 2015—the date of the altercation—he visited Pamela's home "six or seven times." (*Id.* at 42). When asked why he visited Pamela's home "on so many occasions," Torman

testified, "One time I took her a washer and dryer, one time I delivered a TV, another time I delivered a bed[.]" (*Id.*). According to Torman, as of May 13, 2015, he and Pamela were engaged in a business, in which they would "buy and sell things on Facebook" to make money. (*Id.* at 42-43). Torman testified that on May 13, 2015, he went to Pamela's house so that she could "sell an X-Box," "give [the dog] the shots," and reprogram Torman's cell phone. (*Id.* at 43-45).

{¶26} Torman described what happened when he visited Pamela's residence on May 13, 2015: "When I arrived I went in and I took the dog and the X-Box in, we had a short conversation, she started to reprogram my phone or however she was doing it, because I couldn't get Internet on it." (*Id.* at 44). According to Torman, when Pamela reset and reprogramed his phone, "it connected," "[a]nd that's when everything started downloading." (*Id.* at 45). Torman testified that Pamela became "very upset" when a picture "that she didn't approve of" downloaded. (*Id.*). The picture was of another female. (*Id.*). Torman testified, "I mean she just started yelling and cussing at me and told me how worthless I was, and she accused me if [sic] being with this girl when we was living together." (*Id.* at 46).

{¶27} Torman testified that he was at Pamela's house "10, 15 minutes." (*Id.*). Specifically, Torman testified that the argument began five minutes after he arrived and that the yelling and arguing continued "four or five minutes,

approximately." (*Id.*). According to Torman, Pamela told him "to leave, get the hell out of her house," so Torman left. (*Id.*). Torman testified that there was not a "second argument" between them during his visit; he left after the first argument ended because Pamela told him to leave. (*Id.*). Torman testified, "I actually walked out the door and forgot my dog, and turned around back in and got my dog and then walked out. * * * And then that's when she exited to go to the neighbors." (*Id.* at 48). According to Torman, at no time during his visit did he see Cassidy or Kihm. (*Id.*).

**{¶28}** Torman testified that he did not grab Pamela's jaw, strike her, or tell her he was going to cause her any type of harm. (*Id.* at 47). Torman elaborated on the degree to which he came in physical contact with Pamela during his visit:

> The only contact I had, I was standing there because when she was going through my settings, I was trying to get her to show me how to do it versus just doing it, because I've had trouble numerous times before and she's fixed them, so I was standing there, so when all of the pictures come up and we got in the altercation, I mean she kind of come up almost like she was going to throw my phone at the same time, and I just grabbed my phone, that was the only time I had any contact, you know, where I was close enough.

(*Id.*). According to Torman, he grabbed his phone "[s]o she wouldn't throw it and break it." (*Id.*).

{¶29} Torman testified that he was contacted by Strick. (*Id.* at 49). According to Torman, when Strick asked him if he harmed Pamela, Torman told Strick, "[N]o, I hadn't touched her." (*Id.* at 49-50). Torman testified that Strick made a suggestion "about taking a polygraph," and Torman said that he would take a polygraph, but Strick never set that up. (*Id.* at 50). Torman testified that, as he was pulling away in his truck from Pamela's residence, his "back glass on the passenger side got shattered." (*Id.*). When asked if he knew who shattered the window, Torman testified, "I didn't see her throw it, but I'm sure it's Pam because Pam was the only one outside." (*Id.*). Torman did not identify what shattered his window but "assume[s] it was a rock." (*Id.*). According to Torman, he reported the shattered window to law enforcement. (*Id.* at 51). However, when asked why he did not "make a report on that particular incident," Torman responded: "Because I've had incidents before with her where she broke things, and what they tell me is she can kick the door in, she can do whatever she wants because she is my wife, she owns the truck, you know, it was kind of moot, it was pointless." (*Id.*). According to Torman, the truck is titled in his name, "[b]ut the law says it's both of ours because we're still married." (*Id.*).

{¶30} On cross-examination, Torman admitted that he did not show the broken glass on his truck to a law enforcement officer. (*Id.* at 52). Torman testified that it was his understanding after speaking with the law enforcement officer that law enforcement "would be coming out to [Torman's] residence to take a statement." (*Id.* at 52-53). Torman never took his phone to the law enforcement officer to show him the downloaded photographs. (*Id.* at 52).

{¶31} We first review the sufficiency of the evidence of identity supporting Torman's conviction. *See State v. Velez*, 3d Dist. Putnam No. 12-13-10, 2014-Ohio-1788, ¶ 68, citing *State v. Wimmer*, 3d Dist. Marion No. 9-98-46, 1999 WL 355190, *1 (Mar. 26, 1999). Pamela testified that she and Torman got into an argument and that Torman grabbed her chin and jaw and squeezed, resulting in "a little bruising." (Aug. 6, 2015 Tr. at 8). Pamela's testimony alone constitutes sufficient evidence that Torman caused Pamela physical harm by grabbing and squeezing her chin and jaw and that Torman acted knowingly because he was aware that grabbing and squeezing Pamela's chin and jaw would probably cause physical harm. *See State v. Ward*, 3d Dist. Seneca No. 13-07-21, 2008-Ohio-84, ¶ 15-21; *State v. Summers*, 11th Dist. Ashtabula No. 2002-A-0074, 2003-Ohio-5866, ¶ 31.

{¶32} Still, in addition to Pamela's testimony, Strick testified that he observed "a slight red mark on the right side of [Pamela's] jaw." (Aug. 6, 2015

Tr. at 42). Cassidy testified that she observed bruising on the left side of Pamela's face, as well as scratches. When asked about whether she observed any injuries to Pamela, Kihm testified, "I think her face was red." (*Id.* at 31). That Pamela's injuries were minor, that Pamela did not seek medical attention, and that Pamela did not miss work are of no legal consequence concerning whether there is sufficient evidence that Torman knowingly caused or attempted to cause physical harm to Pamela. *See* R.C. 2901.01(A)(3) (defining "physical harm to persons" as "*any* injury, illness, or other physiological impairment, *regardless of its gravity or duration*" (emphasis added)). *See also Ward* at ¶ 15-21; *State v. Marrero*, 10th Dist. Franklin No. 10AP-344, 2011-Ohio-1390, ¶ 72; *State v. Boldin*, 11th Dist. Geauga No. 2007-G-2808, 2008-Ohio-6408, ¶ 41-42. Accordingly, after viewing the evidence in a light most favorable to the prosecution, we hold that a rational trier of fact could have found the essential elements of domestic violence proven beyond a reasonable doubt. Therefore, Torman's domestic-violence conviction is based on sufficient evidence.

{¶33} We next address whether Torman's domestic-violence conviction is against the manifest weight of the evidence. *See Velez*, 2014-Ohio-1788, at ¶ 76. We agree with Torman that the State's evidence is fraught with inconsistencies. At least one aspect of Pamela's account of the incident changed during her testimony. She testified at one point on direct examination that she knocked on

Kihm's door, then at another point on direct examination, testified, "I didn't knock on her door I just yelled." (Aug. 6, 2015 Tr. at 11). Moreover, Pamela's and Kihm's versions of the events contradict one another. Pamela testified that the only physical touching—Torman grabbing and squeezing her chin and jaw—took place in her living room. But Kihm testified that she opened the door of her apartment and saw Torman "shoving her and stuff." (*Id.* at 26). The testimony of Pamela and Strick is also inconsistent. Whereas Pamela testified that Torman squeezed her chin and jaw with one hand, Strick testified that Pamela said Torman used both hands.

{¶34} Kihm's testimony is inconsistent. She testified at first on direct examination that she opened her door when she heard yelling; but then she testified when asked again on direct examination, "No, actually her daughter opened the door and came in." (*Id.*). Kihm also testified at first that she observed a man shove Pamela, then admitted that she did not actually see any physical contact between Pamela and the man, who was Torman. The testimony of Kihm and Cassidy is contradictory. Kihm testified that Cassidy came over to Kihm's with a friend after Kihm heard the altercation, that Cassidy was upset, and that Cassidy was trying to dial 911. On the other hand, Cassidy testified that she went alone to Kihm's residence before Torman arrived at Pamela's residence.

{¶35} Also weighing against Torman's conviction is his testimony that he did not grab or strike Pamela and that the only physical contact he had with Pamela that day was when he grabbed his phone away from Pamela.

{¶36} Despite the inconsistencies in the State's evidence and Torman's testimony, there is evidence weighing in favor of Torman's conviction. In addition to the evidence we discussed in our sufficiency-of-the-evidence analysis above, both Cassidy and Kihm testified that they heard yelling from Pamela *and* Torman. Some evidence also undermined Torman's version of the events, and therefore his credibility. Notwithstanding Torman's assertion that Pamela broke his truck window by throwing something at it, and notwithstanding Strick's request to see the truck window, Torman never showed Strick the truck window. Nor did Strick find any glass at the scene.

{¶37} In sum, there undeniably is a conflict between Pamela's and Torman's versions of the events—specifically, as to what triggered the altercation and the degree to which Torman made physical contact with Pamela. On balance, the testimony of Kihm, Strick, and Cassidy does little to support one version of events over another. Consequently, this case hinges on Pamela's and Torman's credibility. "It is axiomatic that the trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible." *Miller*, 2013-Ohio-3194,

at ¶ 48, citing *State v. Thompson*, 3d Dist. Crawford No. 3-10-23, 2011-Ohio-3631, ¶ 13, citing *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). Accordingly, because the trial court was in the best position to resolve issues of credibility, and because evidence weighs in favor of the conviction, we cannot conclude that the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Despite the inconsistencies in the State's evidence, this still is not one of the "exceptional cases" in which we should overturn the trial court's judgment. *Haller*, 2012-Ohio-5233, at ¶ 9, citing *Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, at ¶ 119. Torman's conviction for domestic violence is not against the manifest weight of the evidence.

{¶38} Torman's assignment of error is overruled.

{¶39} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI and ROGERS, J.J., concur.**

**/jlr**